2009 OK 52

**Danny DYE and Pat Dye, Husband and Wife, Plaintiffs/Appellants,**

v.

**CHOCTAW CASINO OF POCOLA, Oklahoma, and The Choctaw Nation of Oklahoma, Defendants/Appellees.**

No. 104,737.

Supreme Court of Oklahoma.

June 30, 2009.

Rehearing Denied April 12, 2010.

Daniel W. Walker, Fort Smith, AR, for plaintiffs/appellants.

Robert Lee Rabon, Hugo, Oklahoma, Dennis W. Arrow, Oklahoma City, OK, for defendants/appellees.

Graydon Dean Luthey, Jr., Tulsa, Oklahoma, Diane Hammons, Tahlequah, OK, for Cherokee Nation and Cherokee Nation Businesses, LLC, amici curiae.

Deanna Hartley–Kelso, Debra Gee, Stephen H. Greetham, Jesse D. Green, Ada, OK, for Chickasaw Nation, amicus curiae.

William R. Norman, Jr., Kirke Kickingbird, Klint A. Cowan, Oklahoma City, OK, for Comanche Nation Gaming Corporation and Sac and Fox Nation Business Enterprises, Inc., amici curiae.

Larry A. Tawwater, Darren M. Tawwater, Rex Travis Paul Kouri, Oklahoma City, OK, for The Oklahoma Association for Justice, amicus curiae.

## PER CURIAM.

¶1 One question is presented in this appeal: Is the state district court a court of competent jurisdiction as used in the gaming compact between the Choctaw Nation of Oklahoma and the State of Oklahoma such that the district court may exercise jurisdiction over this Indian-country arising negligence action filed by a casino patron against the Choctaw tribe and its casino? We answer in the affirmative.

¶2 The Choctaw Nation of Oklahoma, a federally recognized Indian tribe [1] (Tribe), owns a casino which it operates through its tribal enterprise, the Choctaw Casino of Pocola, Oklahoma (casino). The Tribe offers class III gaming [2] to its casino's patrons pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2722 (1988), and the State–Tribal Gaming Act, 3A O.S.Supp.2004, §§ 261–281, which includes the statutory "Model Tribal Gaming Compact" (compact), id. § 281, signed by the Tribe and effective February 9, 2005.[3]

¶3 On December 6, 2005, Danny Dye and Pat Dye (Dyes) visited the casino. According to the Dyes, Danny Dye [4] left the gaming

---

1. Notice of Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs published in the Federal Register on April 4, 2008. 73 FR 18553–01.

2. Class III gaming is high-stakes casino-style gambling such as electronic games of chance, slot machines and banking card games. 25 U.S.C. § 2703(8); 3A O.S.Supp.2004, § 281, Part 3(5); Seminole Tribe of Florida v. Florida, 517 U.S. 44, 48 n. 1, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

3. The Tribe duly executed the compact and submitted it to the Secretary of the Interior for approval. The Secretary of the Interior did not approve the compact. The compact was considered approved forty-five days after its submission, 25 U.S.C. § 2710(d)(7)(C), and became effective Feb. 9, 2005, the date notice was published in the Federal Register. 70 FR 6903.

4. There are no allegations that Danny Dye is a member of the Choctaw Nation or that he is subject to tribal regulation as a tribal member.

area of the casino, and while he was walking through the parking lot, a casino shuttle cart driven by a casino employee ran into him. Danny Dye was injured. The Dyes submitted a notice of tort claims to the casino and the Tribe as provided in the compact,[5] alleging that Danny was seriously injured by the negligence of the casino's shuttle-cart driver. When the Tribe and the casino failed to act upon the tort claim, it was deemed denied.

¶ 4 The Dyes filed a tort action in the state district court in LeFlore County against the casino and the Tribe. The Tribe moved to dismiss the tort action on the basis of tribal sovereign immunity to suit in state court, arguing that Oklahoma state courts may not exercise jurisdiction over a sovereign Indian tribe unless Congress or the Indian tribe has clearly consented to suit in state court or waived tribal immunity. The Dyes responded that the Tribe consented to suit in the compact, which, at Part 6(A)(2), states that the "tribe consents to suit on a limited basis with respect to tort claims" and, at Part 6(C), states that the "tribe consents to suit against the enterprise in a court of competent jurisdiction with respect to tort claims." The Tribe contended that the declaration in Part 9 of the compact that "(t)his Compact shall not alter tribal, federal or state civil adjudicatory or criminal jurisdiction," places subject-matter jurisdiction exclusively in tribal court and therefore, that the consent to suit in a court of competent jurisdiction in the compact is consent to suit in tribal court only. The Honorable Ted A. Knight, Judge of the District Court, concluded that tribal courts and federal courts have jurisdiction over Indian tribes but state courts do not and dismissed the action.

▋ ¶ 5 The Dyes appealed the dismissal, and this Court assigned the appeal to the Court of Civil Appeals. Subsequently, we received another appeal from the LeFlore County district court presenting the same issues under the compact with the Choctaw Nation in *Griffith v. Choctaw Casino of Poco-*

*la, Oklahoma,* No. 104,887. We denied Griffith's request to make her appeal a companion case with this one, but noted the appeals are related. Thereafter, this Court received a certified question as to whether the district court in Rogers County, Oklahoma, is a "court of competent jurisdiction" as that phrase is used in the tribal gaming compact between the Cherokee Nation and the State of Oklahoma in *Cossey v. Cherokee Nation Enterprises, LLC,* No. 105,300.

¶ 6 The Court of Civil Appeals reversed the district court's dismissal and remanded this case. Although the Court of Civil Appeals reached the same result we reach today, we granted the petition for writ of certiorari filed by the Tribe and its casino because of the significance of the question as to whether a state district court is a court of competent jurisdiction under the Model Tribal Gaming Compact, *3A O.S.Supp.2004, § 281.*

¶ 7 We recently handed down our opinion in *Cossey v. Cherokee Nation Enterprises, LLC,* 2009 OK 6, 212 P.3d 447, 460 (mandate issued June 11, 2009), holding that the state district court is a court of competent jurisdiction as that phrase is used in the Cherokee Nation's tribal gaming compact. Today, in separate opinions in this case and in the related case of *Griffith v. Choctaw Casino of Pocola, Oklahoma,* we determine that Oklahoma district courts are courts of competent jurisdiction as that phrase is used in Oklahoma's statutory model tribal gaming compact, and that the state courts may exercise jurisdiction over the tort claims against the Choctaw Nation and its casino in Pocola, Oklahoma.

¶ 8 In *Griffith v. Choctaw Casino of Pocola, Oklahoma,* 2009 OK 51, 230 P.3d 488 handed down simultaneously, we considered the adjudicatory authority of the state district courts under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2722, and the State–Tribal Gaming Act, 3A O.S.Supp.2004,

---

5. In Part 6, the compact sets forth a pre-judicial procedure similar to that in the state's statutory regime for governmental tort claims. *3A O.S.Supp.2004, § 281.* The pre-judicial procedure requires a tort claimant to give notice of the claim to the Indian tribe and its enterprise as a prerequisite to filing a judicial proceeding. If the tribe or the enterprise does not act upon the notice, the tort claim is deemed denied. Upon denial of the claim, the claimant may seek a judicial remedy.

§§ 261–281. This appeal, like *Griffith,* involves tort claims arising at the Choctaw Casino of Pocola, Oklahoma, and it presents a legal question identical to that in *Griffith* as to the jurisdiction of the state district court and the exercise of state adjudicatory authority over the Choctaw Nation. Rather than repeat at length our consideration and reasoning set out in *Griffith,* we adopt our *Griffith* opinion and base our conclusion and holding in this case upon *Griffith.* In doing so, we acknowledge that we considered this case and the related *Griffith* case simultaneously, and we are grateful for the thoughtful argument and authorities presented by the parties' counsel herein and the assistance of the *amici curiae.*

¶ 9 Accordingly, for the reasons expressed in *Griffith v. Choctaw Casino of Pocola, Oklahoma,* 2009 OK 51, 230 P.3d 488 we conclude and hold that the state district court is a court of competent jurisdiction as that term is used in the Model Tribal Gaming Compact codified at *3A O.S.Supp.2004, § 281.* Our holding in this case does not change, diminish, or expand the jurisdiction of tribal courts nor take away the right of a tort claimant to select the forum-federal, state, or tribal-in which to file a tort action.

**OPINION OF THE COURT OF CIVIL APPEALS VACATED; DISMISSAL ORDER OF THE DISTRICT COURT REVERSED; CAUSE REMANDED TO THE DISTRICT COURT FOR FURTHER PROCEEDINGS.**

TAYLOR, V.C.J., and OPALA, WATT, WINCHESTER, and COLBERT, JJ., concur.

KAUGER, J., (by separate writing) concurs in part and dissents in part.

EDMONDSON, C.J., and HARGRAVE and REIF (by separate writing), JJ., dissent.

KAUGER, J., concurring in part/dissenting in part:

¶ 1 My analysis of the core issues remains unchanged from what I expressed in *Cossey v. Cherokee Nation Enterprises, LLC.,* 2009 OK 6, 212 P.3d 447 (rehearing denied June 11, 2009). I was troubled by two implications in *Cossey.* The writing implied that: 1) tribal courts are not courts of competent jurisdiction; and 2) jurisdiction might depend on whether the casino patron was an Indian or a non-Indian. Today's opinion clearly dispels these concerns, holding that: 1) the casino patron may select tribal courts as a forum for bringing such a tort claim because a tribal court is "court of competent jurisdiction;" and 2) recognizing that the plaintiff is a non-Indian, non-tribal member who voluntarily entered onto tribal land to do business, thus subjecting herself to potential tribal court jurisdiction.

¶ 2 Nevertheless, the majority's analysis of the issues continues to bother me. The majority opinion states: "[w]e conclude that the Tribe clearly and unequivocally consented to be sued for tort damages by a casino patron whether suit be brought in state court, federal court or tribal court." I agree that the first portion of this statement is true, the Tribe clearly and unequivocally consented to be sued for tort damages by a casino patron. It is the remainder of the statement which is unsupported. The crux of this dispute, and the reason for five separate writings in this cause as well as five separate writings in *Cossey,* is that the compact is obviously ambiguous because it *does not clearly and unequivocally* state which court has jurisdiction.

¶ 3 The majority makes the finding of clarity without supporting evidence. Nevertheless, the Court might have had the opportunity to shed light on this ambiguity. The State Treasurer, in his capacity as lead State negotiator for the 2004 Model Gaming Compact, filed leave of the Court on May 15, 2008, to file a statement regarding the compact. However, the Court is precluded from considering this statement [whatever it says] because the application was denied and the statement was stricken from the record on May 27, 2008.[1] We are once again faced with the same problem as in *Cossey*—the need to remand the matter to consider extrinsic evidence of the parties' intent.[2]

1. A copy of the order is *attached* to this writing.

¶ 4 I agree that there is no express, specific language in the model compact making tribal law or tribal courts the exclusive forum for a wrongfully injured casino patron. This leads to the compact's ambiguity. The compact does, however, specifically provide, in Part 9, that "[t]his compact shall not alter tribal, federal or state civil adjudicatory or criminal jurisdiction." Alteration may occur by expansion or contraction. Because Oklahoma is not a P.L. 280 state,[3] I believe that what is clear is that state court jurisdiction has been expanded.

¶ 5 The majority opinion acknowledges that the question of whether exclusive jurisdiction over torts arising on tribal land was vested in tribal courts at the time the compact was executed has not been well-settled. Yet, settling this question is critical to the analysis because of the Part 9 language. Neither the majority in today's opinion nor *Cossey* discusses or analyzes any of the cases which have addressed this issue and unanimously held that the tribal courts have jurisdiction (some negotiated under the compact, some inherent).[4] In addition to side stepping the issue, the Court appears to have enlarged

**2.** Although it was again ignored by the Court, the Governor of Oklahoma and the State Treasurer attached as exhibits to their Amicus Curiae brief filed on March 9, 2009, in *Cossey v. Cherokee Nation Enterprises, LLC.*, 2009 OK 6, 212 P.3d 447 copies of sworn affidavits which indicate that they negotiated and signed the compact with the intent that the phrase "a court of competent jurisdiction" was not a provision intended to extend the jurisdiction of State courts. Rather, it was intended to preserve preexisting Tribal court jurisdiction over claims arising in Indian country against Indian Tribes.

**3.** Public law 83–280 (commonly referred to as Public Law 280 or PL 280) was a transfer of legal authority (jurisdiction) from the federal government to state governments. Some states, including California, were given extensive criminal and civil jurisdiction over tribal lands within the affected states whereas Oklahoma was not given, nor did it assume, equivalent authority to apply or enforce its state civil or criminal laws in Indian country.

**4.** For example, in *Hatcher v. Harrah's NC Casino Company, LLC.*, 169 N.C.App. 151, 610 S.E.2d 210 (2005), the North Carolina Court of Appeals addressed whether the state courts had subject matter jurisdiction to resolve a dispute between a casino patron who alleged that he won a jackpot and the casino's management company. The compact between the Tribe and the State granted regulatory, criminal jurisdiction to the State, but it did not expressly grant civil jurisdiction to the State with respect to the parties' dispute. The court concluded that the exercise of state court jurisdiction in the action would unduly infringe on the self-governance of the tribe. *See also, Bonnette v. Tunica–Biloxi Indians*, 873 So.2d 1 (La.Ct.App.2003) which recognized that the Tribe *retained* jurisdiction of tort claims of patrons of casinos in a compact which provided that the "full territorial and subject matter jurisdiction" of the Tribe was preserved and that the Tribe would adopt procedures for disposition of tort claims. This conclusion was reached despite the compact also containing a provision which stated that the State and the Tribe had concurrent juris-

diction to fully "ensure the protection of the public," the Tribe and the State. A New Mexico case, *Gallegos v. Pueblo of Tesuque*, 132 N.M. 207, 46 P.3d 668 (2002), dealt with the subject matter jurisdiction of state courts over a tort claim brought by a non-Indian against an Indian Tribe for injuries suffered at the tribe's gaming facility. At the time of the alleged tort, there was no valid gaming compact in force. The Court held that trial courts of New Mexico lacked jurisdiction in the matter absent a valid agreement between the tribe and the state permitting the state court to hear the matter. A subsequent case, *Doe v. Santa Clara Pueblo*, 141 N.M. 269, 154 P.3d 644, 646–647 (2007) was heard after a valid gaming compact was executed between the Tribe and the State. The compact contained specific language concerning tort claims and jurisdiction The Court held both that the compact created a concurrent State–Tribal jurisdiction for personal injury tort claims, by agreement of the parties, and that IGRA permitted such a negotiation and outcome. *Diepenbrock v. Merkel*, 33 Kan.App.2d 97, 103, 97 P.3d 1063 (Ct.App.2004) considers subject matter jurisdiction for a wrongful death action. The deceased died of a heart attack suffered on tribal land owned in fee by the tribe. The tribal gaming compact gives the tribe civil jurisdiction for tort matters relating to Class III gaming on their reservation. The Court spoke to the linchpin of the matter, at p. 1067, recognizing that "[i]t would undermine the authority of the tribal courts over reservation affairs and hence would infringe on the right of the Prairie Band Potawatomi Nation to govern themselves if jurisdiction did not reside in the tribal courts in this case. ..." In *Kizis v. Morse Diesel International*, 260 Conn. 46, 794 A.2d 498 (2002) the Connecticut Supreme Court addressed the issue of jurisdiction in a case involving a patron of a tribal casino who brought a negligence action against the Tribe's employees seeking damages for personal injuries sustained at the casino. The Court held that subject matter jurisdiction was lacking in state court and that the proper forum was the Mohegan Gaming Disputes Court. This result was reached after the Court considered the express language of the compact, the

state court jurisdiction beyond what existed prior to the compacts. The Court concludes that the words "tribal court only" could have been typed in the compact, but were not. The Court also notes that the tribe consents to suit twice in the compact, yet it only refers to "court of competent jurisdiction" rather than specifically providing for suit in "tribal court only."

¶ 6 Part 6(A)(2), in which the tribe consents to suit, is limited by subsection "C of this part." Subsection C contains the language regarding court of competent jurisdiction. Obviously, the compact could have referred to "tribal court only," "state court only," or "both" courts to reflect the parties' intent, but it does not. Consequently, the portion of the compact in which existing jurisdiction *is not altered* becomes imperative when determining intent—yet the question remains ignored and the Court merely pontificates about the meaning. I do believe that because one size doesn't fit all insofar as tribal courts are concerned, the compact language was deliberately left nonspecific so that the compact could be adapted to fit various jurisdictional scenarios.

¶ 7 All statutory ambiguities are generally construed in favor of Indian sovereignty.[5] Evidence of what the compacting parties truly intended can also be found by considering the compact as a whole.[6] The Court neglects to consider that in addition to tort claims, the same provisions apply for prize claim disputes. Immunity is waived for prize claim disputes and procedures are set forth much like tort claims. Did the federal government (through IGRA) and the State of Oklahoma and Oklahoma Indian Tribes (through compacting) intend that if a patron enters onto tribal land, voluntarily engages in tribal gaming activities, disputes a prize claim (or lack thereof), that the plaintiff could readily choose between three forums as the concurring opinion suggests?

¶ 8 While this may one day be the law—depending on what the United States Supreme Court ultimately decides—it is not

fact that the tribal constitution provided a forum and mechanism to redress the patron's injuries and IGRA permitted such a result. In *Gaming Corporation of America v. Dorsey & Whitney*, 88 F.3d 536 (8th Cir.1996), a case from the 8th Circuit Court of Appeals involving a lawsuit between a tribal casino management company and a law firm representing the Ho–Chunk Nation. Although the lawsuit was not a tort claim from a casino patron, the Court's discussion of IGRA is illuminating in that it noted that "[T]he legislative history indicates that Congress did not intend to transfer any jurisdictional or regulatory power to the states by means of IGRA unless a tribe consented to such a transfer in a tribal-state compact." The Court also recognized that "Tribal–State compacts are at the core of the scheme Congress developed to balance the interests of the federal government, the states, and the tribes. They are a creation of federal law, and IGRA prescribes 'the permissible scope of a Tribal–State compact.'"

**5.** *Duke v. Absentee Shawnee Tribe of Oklahoma Housing Authority*, 199 F.3d 1123, 1125 (10th Cir.1999), *cert denied*, 529 U.S. 1134, 120 S.Ct. 2014, 146 L.Ed.2d 963 (2000).

**6.** As the majority notes, the compact is a state statute. The primary goal of statutory interpretation is to ascertain and follow the intent of the Legislature. *King v. King*, 2005 OK 4, ¶ 22, 107 P.3d 570; *TRW/Reda Pump v. Brewington*, 1992 OK 31, ¶ 5, 829 P.2d 15; *Ledbetter v. Oklahoma Alcoholic Beverage Laws Enforcement Comm'n*, 1988 OK 117, ¶ 7, 764 P.2d 172; *Hess v. Excise Bd. of McCurtain County*, 1985 OK 28, ¶ 6, 698 P.2d 930. Where a statute's meaning is ambiguous or unclear, we employ rules of statutory construction to give the statute a reasonable construction that will avoid absurd consequences. *Dean v. Multiple Injury Trust Fund*, 2006 OK 78, ¶ 9, 145 P.3d 1097; *Head v. McCracken*, 2004 OK 84, ¶ 16, 102 P.3d 670; *TRW/Reda Pump v. Brewington*, supra. It is important in construing the Legislative intent behind a word to consider the whole act in light of its general purpose and objective, considering relevant portions together to give full force and effect to each. *Saul v. Alcorn*, 2007 OK 90, ¶ 19 fn. 31, 176 P.3d 346; *King v. King*, supra; *Simpson v. Oklahoma Alcoholic Beverage Control Bd.*, 1965 OK 206, ¶ 18, 409 P.2d 364; *Oklahoma Natural Gas Co. v. Corporation Comm'n of Okla.*, 1923 OK 400, ¶ 0, 216 P. 917. A statute will be given a construction, if possible, which renders every word operative, rather than one which makes some words idle and meaningless. *State ex rel. Thompson v. Ekberg*, 1980 OK 91, ¶ 7, 613 P.2d 466; *Integrity Mut. Cas. Co. v. Garrett*, 1924 OK 721, ¶ 11, 229 P. 282; *Matthews v. Rucker*, 1918 OK 29, ¶ 5, 170 P. 492.

We presume that the Legislature expressed its intent and intended what it expressed, and statutes are interpreted to attain that purpose and end, championing the broad public policy purposes underlying them. *McClure v. ConocoPhillips, Co.*, 2006 OK 42, ¶ 12, 142 P.3d 390; *King v. King*, supra; *Cox v. State ex rel. Okla. Dept. of Human Services*, 2004 OK 17, ¶ 19, 87 P.3d 607.

now, nor has the concurring opinion provided any support in its assertions to show that it is. The majority's analysis is bottomed on the traditional right of a plaintiff in a civil lawsuit to choose the venue of the lawsuit. Again I ask, why would Congress have included a provision in IGRA allowing Tribes and States to negotiate an allocation of jurisdiction to the states if state courts, federal courts, and tribal courts already had such jurisdiction? If this were true, the jurisdiction provisions of IGRA are meaningless.

¶ 9 I am also puzzled by the majority's use of the "voter-approved" compact by citing the ballot title in its attempt to bolster the argument that the compact is no ordinary contract and that the voters somehow approved one court's jurisdiction over another. The verbatim recitation of the ballot title clearly shows the voters neither implicitly nor expressly knowingly voted concerning the jurisdiction of tort claims. At 2004 Okla. Sess. Laws, ch. 316, it provides:

> This measure creates the State–Tribal Gaming Act. It would allow some types of gaming machines at some horse race tracks in this state. The Oklahoma Horse Racing Commission would oversee the new types of gaming machines. It would require that a portion of the money wagered on such gaming be paid to the state. Some of the money would go to purses for horse races. Some of the money would go to the horse race tracks. The measure also provides a model compact which Indian tribes may enter into and then operate such gaming machines on Indian lands. The model compact provides regulatory controls for gaming authorized by the compact. The Office of State Finance would have the authority to oversee this gaming by the tribes. The state's portion of the money from the gaming authorized by this

act would go for treatment of compulsive gambling disorders, to the Education Reform Revolving Fund and for college scholarships.

Clearly, the voters were asked to decide whether to allow gaming at race tracks and gaming on Indian land. There is nothing in this measure notifying the voter of anything at all regarding tort claims, much less which court would have jurisdiction of such claims. Consequently, the premise of both the majority opinion and the concurring opinion that "court of competent jurisdiction" is voter-sanctioned to be the state courts over the tribal court is inexplicable.

¶ 10 The majority opinion surmises that the state, by virtue of IGRA and the language of the compact, acquires concurrent jurisdiction with tribal courts over gaming-related tort claims against Indian Tribes which have a Gaming Compact with the state. To reach this conclusion, the majority must assume, without deciding, that courts of the State of Oklahoma are generally courts of competent jurisdiction to adjudicate tort claims against Indian tribes for tribal activity on tribal land. It intimates that this jurisdiction is established by the authority of the Oklahoma constitution and that no federal law or state statute may alter it.

¶ 11 The fallacy of this reasoning is exemplified by the Federal Indian Child Welfare Act (FICWA). Under certain circumstances Oklahoma lacks any authority over an Indian child.[7] For instance, if the child lives on trust or restricted land, or in a dependent Indian community, the state may not have the authority to proceed and the case must be heard in tribal court. In other cases, jurisdiction with the state is concurrent, but the state, in the absence of good cause, must transfer the proceeding to the tribal court.[8]

---

7. 25 U.S.C.A. § 1901 et seq.

8. 25 U.S.A. § 1911 (1978) provides:
(a) Exclusive jurisdiction
An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law. Where an Indian child is a ward of a tribal court, the Indian tribe shall retain exclusive jurisdiction, notwithstanding the residence or domicile of the child.
(b) Transfer of proceedings; declination by tribal court
In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of

The FICWA, as does IGRA, illustrates that Congress can and does decide whether the State of Oklahoma may assert civil jurisdiction over Indian tribes, notwithstanding the assertion that "adjudicatory jurisdiction is constitutionally vested in our state courts."

## CONCLUSION

¶ 12 The United States Constitution recognizes that Indian Tribes are to be treated on an equal level with the governments of foreign nations as well as the states.[9] The Oklahoma Constitution recognizes that all tribal lands lying within Oklahoma boundaries shall be subject to the jurisdiction of the United States.[10] IGRA embodies the general goal of federal Indian policy: to allow tribal self-government with federal control.[11] It requires states and tribes to negotiate regarding the scope of authorized gaming and the State's role in Indian gaming. As part of this process, IGRA allows states and tribes to negotiate and to include jurisdiction-shifting provisions in the compact.[12]

---

either parent or the Indian custodian or the Indian child's tribe: Provided, That such transfer shall be subject to declination by the tribal court of such tribe.

(c) State court proceedings; intervention

In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding.

(d) Full faith and credit to public acts, records, and judicial proceedings of Indian tribes

The United States, every State, every territory or possession of the United States, and every Indian tribe shall give full faith and credit to the public acts, records, and judicial proceedings of any Indian tribe applicable to Indian child custody proceedings to the same extent that such entities give full faith and credit to the public acts, records, and judicial proceedings of any other entity.

9.   Art. 1, § 8 of the United States Constitution provides that "[t]he Congress shall have the power to ... regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

10.   Art. 1, § 3 of the Oklahoma Constitution provides in pertinent part:

The people inhabiting the State do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian, tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States. . . .

11.   Title 25 U.S.C. § 2701 provides:

The Congress finds that—

(1) numerous Indian tribes have become engaged in or have licensed gaming activities on Indian lands as a means of generating tribal governmental revenue;

(2) Federal courts have held that section 81 of this title requires Secretarial review of management contracts dealing with Indian gaming, but does not provide standards for approval of such contracts;

(3) existing Federal law does not provide clear standards or regulations for the conduct of gaming on Indian lands;

(4) a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government; and

(5) Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity.

Title 25 U.S.C. § 2702 provides:

The purpose of this chapter is—

(1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;

(2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and

(3) to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

12.   Title 25 U.S.C. § 2710(d)(3)(C) provides:

(C) Any Tribal–State compact negotiated under subparagraph (A) may include provisions relating to—

(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

Had Congress not considered tribal courts to have subject matter jurisdiction over lawsuits which relate to or arise out of gaming and gaming enterprises, why would it have included a provision in IGRA which allowed tribes and states to negotiate an allocation of jurisdiction to the states?

¶ 13 This whole discussion may become moot. The compact became effective February 9, 2005, and it does not expire until 2020. At that time it automatically renews for successive 15 year periods. However, the compact also provides that it may be terminated by mutual consent. If the Tribe and the State are truly in accord with what was their mutual intent at the time of compacting, they may terminate and renegotiate the compact insofar as "a court of competent jurisdiction" is concerned.[13]

## ATTACHMENT

## IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

DANNY DYE and PAT DYE,
Husband and Wife,
      Plaintiffs/Appellants,

v.

CHOCTAW CASINO OF POCOLA, OKLAHOMA, and THE CHOCTAW NATION OF OKLAHOMA,
      Defendants/Appellees.

No. 104,737

## ORDER

The Oklahoma State Treasurer's application for leave to file an attached statement,

filed on May 15, 2008, is DENIED, and the statement is STRICKEN.

Done by order of the Supreme Court this 27th day of May, 2008.

/s/ James R. Winchester
    CHIEF JUSTICE

REIF, J., with whom EDMONDSON, C.J., joins, dissenting.

¶ 1 I respectfully dissent.

¶ 2 The case at hand involves the same jurisdictional issue as the case of *Cossey v. Cherokee Nation Enterprises, LLC*, 2009 OK 6, 212 P.3d 447; that is, whether the courts of the State of Oklahoma have jurisdiction of tort claims against an Indian tribe that arise from tribal gaming operations on tribal lands. This controversy stems from the fact that the Gaming Compacts between the State and Indian tribes do not specifically state that State courts have jurisdiction over such claims. The majority opinion in *Cossey* and the majority opinion herein interpret the tribe's "consent to suit in a court of competent jurisdiction" set forth in the Compacts as conferring jurisdiction on State courts. In *Cossey*, I dissented from the majority holding that this language gives State courts jurisdiction over gaming-related tort claims against the Cherokee Nation. The same analysis and authority set forth in my dissent in *Cossey* lead me to likewise dissent from the majority holding herein that this language gives State courts jurisdiction over such tort claims against the Choctaw Nation.

¶ 3 Under the majority interpretations, Oklahoma courts acquire concurrent jurisdic-

      (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

13. Part 15 of the Compact relates to duration and negotiation and it provides in pertinent part: ... B. This Compact shall have a term which will expire on January 1, 2020, and at that time, if organization licensees or others are authorized to conduct electronic gaming in any form other than pari-mutuel wagering on live horse racing pursuant to any governmental action of the state or court order following the effective date of this Compact, the Compact shall automatically renew for successive additional fifteen-year terms; provided that, within one hundred eighty (180) days of the expiration of this Compact or any renewal thereof, either the tribe or the state, acting through its Governor, may request to renegotiate the terms of subsections A and E of Part 11 of this Compact.
C. This Compact shall remain in full force and effect until the sooner of expiration of the term or until the Compact is terminated by mutual consent of the parties. . . .
The state hereby agrees that this subsection is severable from this Compact and shall automatically be severed from this Compact in the event that the United Stated Department of the Interior determines that these provisions exceed the state's authority under IGRA.

tion with tribal courts over gaming-related tort claims against Indian tribes that have a Gaming Compact with the State. The majority herein reasons that if tribal courts were intended to be the only courts of competent jurisdiction to adjudicate tort claims against the tribes, then the tribes would have expressly limited their consent to suit "in tribal court only." The majority cites examples from other compacts where similar limiting language appears and emphasizes that it would have been a simple matter for the tribes to type such a limitation into their respective Compacts.

¶ 4 My disagreement with the majority on this point stems from the fact that the courts of the State of Oklahoma are not generally courts of competent jurisdiction to adjudicate tort claims against Indian tribes for tribal activity on tribal lands. The majority opinions in both *Cossey* and the case at hand acknowledge that the State of Oklahoma did not assume jurisdiction over tribal lands pursuant to Public Law 280. While state courts can acquire jurisdiction over tribes incidental to a Congressional delegation of power to the State to regulate tribal activity, the Federal Indian Gaming Act does not involve a Congressional delegation of power to the State of Oklahoma. Finally, when the State of Oklahoma wants a tribe to submit to the jurisdiction of a state court under a compact, the State of Oklahoma has explicitly said so. *See* 68 O.S.2001 § 500.63(C)(8).

¶ 5 In my opinion, the key to this controversy lies in the sovereign to sovereign status quo that exists between the State of Oklahoma and Indian tribe at the time they enter into any type of compact. This status quo is best described in the Motor Fuel Compact Act: "Both the State of Oklahoma and the accepting Indian tribe recognize, respect and accept the fact that under applicable laws each is a sovereign with dominion over their respective territories and governments." *68 O.S.2001 § 500.63*(C)(10).

¶ 6 In the Federal Indian Gaming Act, Congress expressly authorized the State and Indian tribes to change their sovereignty status quo with respect to (1) the application of the criminal and civil laws and regulations of the Indian tribe or the State and (2) the allocation of criminal and civil jurisdiction between the State and Indian tribe. 25 U.S.C. § 2710(d)(3)(C)(i) and (ii). However, the Gaming Compact between the State of Oklahoma and the Choctaw Nation does not expressly provide for the application of the civil laws of the State of Oklahoma to tribal lands nor does it expressly allocate civil jurisdiction to the courts of the State of Oklahoma. Instead, the Compact plainly states: "This Compact shall not alter tribal, federal or state civil adjudicatory or criminal jurisdiction."

¶ 7 In other words, the Compact does not alter the sovereignty status quo as to courts that possess competent jurisdiction to adjudicate a claim against the tribe for tribal activity on tribal land. In view of this fact, use of the modifying term "competent jurisdiction" to describe the court in which the tribe consents to suit, clearly refers to courts which have jurisdiction to adjudicate claims against the tribe in the absence of the compact. In this context, the modifying term "competent jurisdiction" is just as effective to limit jurisdiction to tribal courts as saying "in tribal courts only."

¶ 8 Even though I dissent from the holdings of the majority opinions, I readily agree with the views expressed in the opinions that one of the key purposes of the Gaming Compacts is to hold tribes liable for personal injury and property loss sustained by patrons and attributable to tribal gaming operations. To achieve this end, the State sought and received (1) the tribe's waiver of sovereign immunity and a claims process to pursue tribal liability comparable to that found in Oklahoma's Governmental Tort Claims Act, (2) the tribe's consent to suit on disputed claims in a court competent to determine tribal liability, and (3) the tribe's assurance that patrons would be afforded due process in seeking and receiving just and reasonable compensation for a tort claim for personal injury or property damage. Nowhere in the Compacts at issue, however, did the State and tribes expressly agree that Oklahoma law would apply in this process or that State courts were empowered to determine tribal liability. Perhaps my chief disagreement with the majority opinions in *Cossey* and the

case at hand lies in the fact that they extend state law and state civil adjudicatory jurisdiction to tribal lands and tribal governments by implication when the parties did not expressly agree to do so in the face of express authority in the Federal Indian Gaming Act on this subject.

¶ 9 In my opinion, the only provision in the Compact that implicates the exercise of *jurisdiction* over a tort claim *by a court other than a tribal court* is the "due process" provision. In this provision, tribes agree to "ensure that patrons of a facility are afforded due process in seeking and receiving just and reasonable compensation for a tort claim for personal injury and property damage." Congress has generally mandated that no Indian tribe in exercising powers of self-government shall deprive any person of liberty or property without due process of law. 25 U.S.C. § 1302. This includes exercise of the tribe's judicial power. 25 U.S.C. § 1301(2). If a tribal court did not afford a tort claimant due process, or the tribe did not provide a court to determine its liability, such denials of due process would present a federal question to support adjudication of a claim in federal court.

¶ 10 For the foregoing reasons I would affirm the district court's dismissal of the plaintiff's district court suit against the Choctaw Casino of Pocola and the Choctaw Nation.