2013 OK 77

**Charles SHEFFER; Jennifer Sheffer; and J.S., a minor by and through his parents and next friends, Charles Sheffer and Jennifer Sheffer, Plaintiffs–Appellants,**

v.

**BUFFALO RUN CASINO, PTE, INC. and Peoria Tribe of Indians of Oklahoma, Defendants–Appellees,**

and

**Carolina Forge Company, L.L.C., David Billups and William Garris, III, Defendants.**

No. 109265.

Supreme Court of Oklahoma.

Sept. 24, 2013.

Rehearing Denied Dec. 2, 2013.

Taylor, J., filed dissenting opinion in which Winchester, J., joined.

Watt, J., filed dissenting opinion in which Colbert, C.J., Winchester and Taylor, JJ., joined.

Ed Hershewe, Joplin, Missouri, Trevor Hughes, J. Christopher Davis, Johnson & Jones P.C., Tulsa, Oklahoma, Richard L. Yohn, Legal Aid Services of Oklahoma, Inc., McAlester, Oklahoma, Attorney for Plaintiffs–Appellants.

Jon Brightmire & Stuart Campbell, Doerner, Saunders, Daniel & Anderson L.L.P., Tulsa, Oklahoma, Attorneys for Defendants–Appellees Peoria Tribe of Indians of Oklahoma.

GURICH, J.

### Facts & Procedural History

¶ 1 This case involves an automobile accident between Plaintiffs and two employees of Carolina Forge Company, L.L.C, the Appellee in *Sheffer v. Carolina Forge Co.*, 2013 OK 48, 306 P.3d 544. While the facts and procedural history of the case are set out in detail in that opinion, in short, Plaintiffs Charles Sheffer, Jennifer Sheffer, and their minor son, J.S., were injured when a rental vehicle leased to employees of Carolina Forge collided with Plaintiffs' 18–wheeler tractor trailer. The driver of the rental vehicle, David Billups, was killed and his passenger, William Garris, was injured.

¶ 2 Plaintiffs sued Carolina Forge in the District Court of Ottawa County on theories of respondeat superior and negligent entrustment. They also sued the Buffalo Run Casino, the Peoria Tribe of Indians of Oklahoma, and PTE, Inc. ("Peoria Tribe") for dramshop liability. The trial judge granted summary judgment in favor of Carolina Forge on both the respondeat superior and negligent entrustment claims. The trial court also dismissed, sua sponte, the Peoria Tribe because injunctions issued by the Honorable Lee R. West in the Western District of Oklahoma in Case No. 10–CV–00050–W [1] and Case No. 10–CV–01339–W,[2] prohibited suit "for any tort claims against a tribe or a tribal entity." [3] Plaintiffs appealed, and we retained

both appeals. In *Sheffer v. Carolina Forge Co.*, 2013 OK 48, 306 P.3d 544, we reversed the trial court's grant of summary judgment to Carolina Forge and found issues of material fact precluded summary judgment on both the respondeat superior and negligent entrustment claims. In this opinion, we consider only the Plaintiffs' claims against the Peoria Tribe.

### Standard of Review

■■■ ¶ 3 A determination of jurisdiction is a question of law. *Seneca Tel. Co. v. Miami Tribe of Okla.*, 2011 OK 15, ¶ 3, 253 P.3d 53, 54. The standard of review for questions of law concerning the jurisdictional power of the trial court to act is de novo. *Dilliner v. Seneca–Cayuga Tribe of Okla.*, 2011 OK 61, ¶ 12, 258 P.3d 516, 519. De novo review involves a plenary, independent, and non-deferential examination of the trial court's rulings of law. *In re Estate of Bell–Levine*, 2012 OK 112, ¶ 5, 293 P.3d 964, 966.

### Analysis

### Model Gaming Compact

¶ 4 Under the Indian Gaming Regulatory Act, state governments may negotiate a gaming compact with tribal governments so that tribes may conduct Class III Gaming on tribal lands. *Griffith v. Choctaw Casino of Pocola*, 2009 OK 51, ¶ 11, 230 P.3d 488, 492. In 2004, Oklahoma voters approved Oklahoma State Question 712, which proposed the negotiated model gaming compact as an offer to federally recognized tribes in the State of Oklahoma to engage in Class III gaming on tribal lands under the terms and conditions of the proposed compact. *Id.* ¶ 13, 230 P.3d at 492. The model gaming compact is codified in the State–Tribal Gaming Act. 3A O.S. 2011 §§ 261–282.

¶ 5 Part 6 of the compact, which governs tort and prize claims by patrons of a casino,

1. *Choctaw Nation of Okla. and Chickasaw Nation v. Oklahoma*, 10–CV–00050–W, 2010 WL 5798663 (W.D.Okla. June 29, 2010).

2. *Comanche Nation, Osage Nation, Delaware Nation, and Wichita and Affiliated Tribes v. Oklahoma*, 10–CV–01339–W (W.D.Okla. Dec. 28, 2010).

3. Nunc Pro Tunc Order to Correct Order Dismissing Defendants, Peoria Tribe of Indians of Oklahoma, Buffalo Run Casino and PTE, Inc. at 2.

provides a limited waiver of tribal immunity and states in subsection C: "The tribe consents to suit against the enterprise in a *court of competent jurisdiction* with respect to a tort claim or prize claim if all requirements of paragraph 9 of subsection A or all requirements of paragraph 11 of subsection B of this Part have been met; provided that such consent shall be subject to the following additional conditional limitations." [4] The compact does not define "court of competent jurisdiction"; however, it expressly provides in Part 9 that "[t]his Compact shall not alter tribal, federal or state civil adjudicatory or criminal jurisdiction." [5]

¶ 6 In early 2009, this Court asserted state court civil-adjudicatory jurisdiction over compact-based, Indian country tort lawsuits in *Dye v. Choctaw Casino of Pocola*, 2009 OK 52, 230 P.3d 507 (per curiam); *Griffith v. Choctaw Casino of Pocola*, 2009 OK 51, 230 P.3d 488 (per curiam); *Cossey v. Cherokee Nation Enters.*, 2009 OK 6, 212 P.3d 447. In each of those cases, a divided Court held state courts were courts of competent jurisdiction as the term was used in the voter-approved model gaming compact.

¶ 7 In response to the decisions in *Dye*, *Griffith*, and *Cossey*, the Chickasaw and Choctaw Nations and the State of Oklahoma invoked the compact's dispute resolution clause and entered into a joint agreement to arbitrate.[6] The parties agreed to submit to binding arbitral interpretation the issue of whether, "under the Choctaw Nation and State of Oklahoma Gaming Compact and the Chickasaw Nation and State of Oklahoma Gaming Compact, jurisdiction over all Compact based tort claim and/or prize claim lawsuits lies exclusively in Choctaw Nation or Chickasaw Nation forums." [7]

¶ 8 In August 2009, the arbitrator for the dispute found the term "court of competent jurisdiction" as used in Part 6(C) of the Nations' compacts could not properly be interpreted to include the courts of the State of Oklahoma.[8] Subsequent to the arbitrator's decision, the Nations sought to certify and enforce the arbitration award in federal district court as allowed for under Part 12(3) of the compact, which gives the **federal district court exclusive jurisdiction to review "any arbitration award under paragraph 2 of this Part."** [9] The Nations also sought permanent injunctive relief in the federal district court, prohibiting Oklahoma state courts from exercising jurisdiction over any and all compact-based tort or prize claim lawsuits against the Nations.[10]

¶ 9 The federal district court for the Western District of Oklahoma, in an order by the Honorable Lee R. West, agreed with the arbitrator and found Oklahoma state courts were not courts of competent jurisdiction as the term was used in the gaming compact, and any attempt by any Oklahoma state court to exercise jurisdiction over a compact-based tort or prize claim lawsuit against the Nations was a violation of the sovereign immunity of the tribes.[11] The federal district

---

4. Supplement to Record on Accelerated Appeal, Ex. 6 at 28 (emphasis added).

5. *Id.* at 37.

6. Part 12 of the compact, entitled "Dispute Resolution" provides in part:
 In the event that either party to this Compact believes that the other party has failed to comply with any requirement of this Compact, or in the event of any dispute hereunder, including, but not limited to, a dispute over the proper interpretation of the terms and conditions of this Compact, the following procedures may be invoked[.] Supplement to Record on Accelerated Appeal, Ex. 6 at 50. Under Part 12(2) "either party may refer a dispute arising under this Compact to arbitration...." *Id.* at 51.
 "On July 20, 2009, the Nations and the state of Oklahoma executed a *Joint Referral to Binding Arbitration of Disputes Under and/or Arising From*

the *Choctaw Nation of Oklahoma and State of Oklahoma Gaming Compact and the Chickasaw Nation and State of Oklahoma Gaming Compact.*" *Choctaw Nation of Okla.*, 2010 WL 5798663, at *4.

7. *Id.*

8. *Id.* The arbitrator for the dispute was the Honorable Layn R. Phillips. *Id.*

9. *Id.* at *1. *See also* Supplement to Record on Accelerated Appeal, Ex. 6 at 52 (emphasis added).

10. *Id.*

11. *Id.* Although the Choctaw and Chickasaw Nations case was appealed to the United States Court of Appeals for the Tenth Circuit, it was

court issued an order purportedly enjoining the State of Oklahoma, including the courts of this state, from asserting state civil-adjudicatory jurisdiction over compact-based tort or prize claim lawsuits against the Nations.[12] Since the federal district court's decision in the Choctaw and Chickasaw Nations case, subsequent orders, involving other tribes who have submitted the same issue to arbitration, have been issued in *Eastern Shawnee Tribe of Okla. v. Oklahoma*, 10–CV–00459–W (W.D.Okla. July 1, 2010), *Cherokee Nation v. Oklahoma*, 10–CV–979–W (W.D.Okla. Nov. 22, 2010), *Comanche Nation, Osage Nation, Delaware Nation, and Wichita and Affiliated Tribes v. Oklahoma*, 10–CV–01339–W (W.D.Okla. Dec. 28, 2010), and *Tonkawa Tribe of Okla. v. Oklahoma*, 11–CV–782–W (W.D.Okla. Nov. 23, 2011). The orders issued in those cases also purportedly enjoin the courts of this state from exercising state civil-adjudicatory jurisdiction over compact-based tort or prize claim lawsuits involving such tribes.[13]

¶ 10 The trial judge in the case before us took judicial notice of the orders entered by the federal district court and dismissed the Peoria Tribe from the case, finding because "Plaintiffs' claim is a tort arising on Indian land, the injunction currently in place by Judge West is to be followed by all State entities, including the judicial branch, for any tort claims against a tribe or a tribal entity."[14] The Peoria Tribe asks this Court to affirm its dismissal because the gaming compact between the Peoria Tribe and the State of Oklahoma is identical to the gaming compact at issue in the above-mentioned federal court proceedings. As such, the tribe maintains it may not be sued in state court for compact-based tort claims.

¶ 11 Although the gaming compact between the Peoria Tribe and the State of Oklahoma is identical to the gaming compacts at issue in the above-mentioned federal court proceedings,[15] the Peoria Tribe has not invoked the compact's dispute resolution clause and has not entered into a joint agreement to arbitrate this issue with the State of Oklahoma. No injunction has been entered enjoining the courts of this state from exercising civil-adjudicatory jurisdiction over compact-based tort or prize claim lawsuits *involving the Peoria Tribe*.[16]

¶ 12 Regardless of whether the injunctions in the above-mentioned proceedings apply to the case before us or whether the federal district court has the power to enforce such injunctions,[17] recent decisions from the feder-

subsequently dismissed by the parties. *See* Order *Choctaw Nation of Okla. and Chickasaw Nation v. Oklahoma*, 10–6150 (10th Cir. Nov. 22, 2010).

12. *Id.* at * 5.

13. None of those orders were appealed.

14. Nunc Pro Tunc Order to Correct Order Dismissing Defendants, Peoria Tribe of Indians of Oklahoma, Buffalo Run Casino and PTE, Inc. at 2.

15. Supplement to Record on Accelerated Appeal, Ex. 5. The Peoria Tribe passed Resolution GLSR–12–11–04–A authorizing the tribe to enter into the gaming compact with the State of Oklahoma. *Id.* The Peoria Tribe and the State of Oklahoma entered into the Model Tribal Gaming Compact on December 14, 2004. *Id.*

16. The injunctions entered in the above-mentioned federal court proceedings are not directly implicated in the case before us because the injunctions specify only the tribes involved in each of those proceedings. For example, in the Choctaw Nation and Chickasaw Nation proceed-

ing, the court purportedly enjoined the State of Oklahoma, including the courts of this state, "from asserting civil-adjudicatory jurisdiction over Compact-based tort claim and/or prize claim lawsuits *against the Nations*." *Id.* Ex. 2, at 9 (emphasis added). "The Nations" referred only to the Chickasaw and Choctaw Nations. *Id.* at 1.

17. As mentioned above, the model gaming compact gives the federal district court exclusive jurisdiction to review an arbitrator's decision. *Id.* Ex. 6 at 52. As such, the federal district court had jurisdiction to conduct a de novo review of the award. *Id.* Upon review, the federal district court certified the award and issued an order enjoining the courts of this state from assuming civil-adjudicatory jurisdiction over compact-based tort or prize claims. *Choctaw Nation*, 2010 WL 5798663, at *5. Although the federal court may have had the authority to enjoin the courts of this state *pursuant to the terms of the compact*, whether the federal court actually has the power to enforce the injunctions against the courts of this state is a completely different issue. Because today's opinion effectively renders the injunctions moot, we need not address this issue.

al courts of this state as well as the above-mentioned arbitration proceedings have caused us to reexamine our previous holdings in *Dye, Griffith,* and *Cossey.* After further consideration, we agree with the federal courts and the arbitrator that Oklahoma state courts are not courts of competent jurisdiction as the term is used in the model gaming compact with regard to compact-based tort or prize claims. The Executive Branch of the State of Oklahoma, specifically the Governor, has been and continues to be the party responsible for negotiating compacts with the sovereign nations of this state.[18] Unless and until the State of Oklahoma renegotiates the model gaming compact to include courts of this state as courts of competent jurisdiction, the courts of this state shall refrain from exercising civil-adjudicatory jurisdiction over compact-based tort or prize claims involving tribes who have entered into the model gaming compact with the State of Oklahoma.[19]

¶ 13 Congress provided in IGRA a "framework for the regulation of gaming activities on Indian lands which provides that in the exercise of its sovereign rights, *unless a tribe affirmatively elects to have State laws and State jurisdiction extend to tribal lands, the Congress will not unilaterally impose or allow State jurisdiction on Indian lands for the regulation of Indian gaming activities." Muhammad v. Comanche Nation Casino,* No. 09–CIV–968–D, 2010 WL 4365568, at *9 (citing S. Rep. 100–446, at 5–6, *reprinted in* 1988 U.S.C.C.A.N. at 3075). Only "an affirmative extension of state civil-adjudicatory jurisdiction by a tribal-state gaming compact will be sufficient" to expand state court jurisdiction to tribal gaming activities. *Id.*

¶ 14 Part 6 of the model gaming compact provides a limited waiver of tribal immunity and a tribe consents to suit for tort or prize claims in a "court of competent jurisdiction."[20] Although, the compact does not define "court of competent jurisdiction," Part 9 of the compact provides: "[t]his Compact shall not alter tribal, federal or state civil adjudicatory or criminal jurisdiction."[21]

¶ 15 In *Muhammad,* 2010 WL 4365568, at *1, the Plaintiff filed suit in the District Court of Comanche County to recover damages for personal injuries suffered in a slip-and-fall accident while at the Comanche Nation Casino. Plaintiff asserted that Oklahoma's gaming compact with the Comanche Nation allowed her to sue the tribe in Oklahoma state court. *Id.* Defendant removed the case to federal court and argued that Oklahoma courts lacked jurisdiction over Plaintiff's tort action because jurisdiction was

---

18. *See* Okla. Const. art. VI, § 8 ("The Governor shall cause the laws of the State to be faithfully executed, and shall conduct in person or in such manner as may be prescribed by law, all intercourse and business of the State with other states and with the United States, . . ."); Okla. Const. art. VI, § 2 ("The Supreme Executive power shall be vested in a Chief Magistrate, who shall be styled 'The Governor of the State of Oklahoma.'"); 3A O.S.2011 § 280 ("The State of Oklahoma *through the concurrence of the Governor after considering the executive prerogatives of that office and the power to negotiate the terms of a compact between the state and a tribe....*") (emphasis added).

19. The State of Oklahoma and tribal representatives specifically negotiated a dispute resolution clause with the goal of "resolv[ing] all disputes amicably and voluntarily whenever possible." Supplement to Record on Accelerated Appeal, Ex. 6 at 50. Arbitration was the method of dispute resolution chosen by the negotiating parties and was used by the state and the above-mentioned tribes in resolving the ambiguity surrounding the "court of competent jurisdiction" phrase. The federal district court, without objection from the State of Oklahoma, certified the arbitration award, amicably resolving the dispute. The dispute resolution method chosen by the negotiating parties and the subsequent decision by the arbitrator deserves this Court's deference. *See Nitro–Lift Technologies L.L.C. v. Howard,* ––– U.S. –––, –––, 133 S.Ct. 500, 503, 184 L.Ed.2d 328 (2012). Additionally, as discussed below, the federal courts of this state have concluded that Oklahoma state courts are not courts of competent jurisdiction as the term is used in the model gaming compact. Although we are not bound by those decisions, in the interest of "achieving harmony between the state and federal courts within our state" in regard to the interpretation of the model gaming compact, we must agree that Oklahoma state courts are not courts of competent jurisdiction to exercise jurisdiction over compact-based tort or prize claims. *Akin v. Missouri Pacific R. Co.,* 1998 OK 102, ¶ 30, 977 P.2d 1040, 1052.

20. Supplement to Record on Accelerated Appeal, Ex. 6 at 21.

21. *Id.* at 37.

exclusively in the tribal courts of the Comanche Nation under the compact. *Id.*

¶ 16 The Honorable Timothy D. DeGiusti of the Western District of Oklahoma found the gaming compact between Oklahoma and the Comanche Nation did not waive tribal sovereign immunity from suit in Oklahoma state courts. *Id.* at *11. The court noted the compact was governed by IGRA and "its strong policy of promoting tribal self-government." *Id.* at *10. The court found: "Nothing in the Compact permits an inference that the tribe intended 'a court of competent jurisdiction to include state courts.' Parts 5 and 6 of the Compact specifically provide for the application of tribal rules and regulations to tort claims by casino patrons against the tribal gaming enterprise, and those regulations limit actions to tribal court." *Id.*

¶ 17 In *Harris v. Muscogee (Creek) Nation*, No. 11–CV–654–GKF–FHM, 2012 WL 2279340, at *1 (N.D.Okla. June 18, 2012), the Plaintiff, a customer of River Spirit Casino, was injured in a slip-and-fall accident at the casino. She filed suit in the District Court of Tulsa County and sought to invoke Oklahoma's gaming compact with the Creek Nation. *Id.* The Creek Nation removed the suit to federal court and argued jurisdiction for Plaintiff's tort claim was exclusively in the tribal courts of the Creek Nation under the compact. *Id.*

¶ 18 The Honorable Gregory Frizzell of the Northern District of Oklahoma held that "nowhere in Part 6 or any other part of the Compact does the tribe consent to extension of state civil-adjudicatory jurisdiction. Rather, the compact provides, 'This Compact shall not alter tribal, federal or state civil adjudicatory or criminal jurisdiction.'" *Id.* at *4. The court found the compact between the Creek Nation and the State of Oklahoma did not waive the tribe's sovereign immunity against compact-based tort suits in Oklahoma state courts. *Id.* at *5.

¶ 19 On January 29, 2013, the Tenth Circuit issued an Order and Judgment in *Santana v. Muscogee (Creek) Nation, ex rel. River Spirit Casino*, 508 Fed.Appx. 821 (10th Cir.

2013), *cert. denied*, —— U.S. ——, 133 S.Ct. 2038, 185 L.Ed.2d 899 (2013). In that case, Mr. Santana, a self-professed gambling addict, invoked Oklahoma's gaming compact with the Creek Nation to sue the tribe in Oklahoma state court. *Id.* at *1. Mr. Santana claimed the Creek Nation induced him to gamble at its casino, resulting in the tribe's unjust enrichment. *Id.* The Creek Nation removed the suit to federal court and argued that its compact with the State of Oklahoma did not extend jurisdiction to Oklahoma state courts to hear civil tort claims against the tribe because state courts were not "courts of competent jurisdiction" under the compact. *Id.* The Honorable James H. Payne of the Northern District of Oklahoma dismissed the Creek Nation and found nothing in the compact waived tribal immunity from civil tort suits brought in state or federal court.[22]

¶ 20 A unanimous three-judge panel of the Tenth Circuit affirmed and found that "[a]lthough the compact does not define a 'court of competent jurisdiction,' it does expressly provide that '[t]his Compact shall not alter tribal, federal or state civil adjudicatory or criminal jurisdiction.'" *Id.* The Tenth Circuit held that "because there is no express grant of jurisdiction to hear compact-based tort suits against the Creek Nation in state court, the phrase 'court of competent jurisdiction' does not include Oklahoma's state courts." *Id.* at *2. In footnote 1, the Tenth Circuit recognized that this Court reached a different conclusion in *Dye*, 2009 OK 52, 230 P.3d 507, *Griffith*, 2009 OK 51, 230 P.3d 488, and *Cossey*, 2009 OK 6, 212 P.3d 447. *Id.* at *2 n. 1.

¶ 21 Additionally, in *Comanche Nation*, the arbitrator specifically construed Part 9 of the compact:

[b]ecause nowhere in any of the Tribes' Class III gaming Compacts is there any material tribal sovereign immunity waiver except "in a court of competent jurisdiction," and **because Part 9 preserved, adopted, and incorporated by reference the jurisdictional status quo ante, there is no express waiver anywhere in the**

**22.** *Id. See also Santana v. Muscogee (Creek) Nation*, No. 11–CV–782–JHP–PJC, 2012 WL 896243 (N.D.Okla. March 15, 2012).

Compact[s] of any of the Tribes' sovereign immunity from any relevant Indian country-arising Class III casino-related lawsuit in any Oklahoma state court.

Supplement to Record on Accelerated Appeal, Ex. 4 at 6 (emphasis added).

¶ 22 As the arbitrator pointed out and as the federal courts of this state have concluded, Part 9 of the gaming compact preserves the civil-adjudicatory jurisdiction status quo—that "states are generally presumed to lack jurisdiction in Indian Country." *Santana*, 508 Fed.Appx. at 823 (citing *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216 n. 18, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987)). Only an express grant of jurisdiction by Congress[23] or adoption of Public Law 280[24] will confer civil-adjudicatory jurisdiction to the State of Oklahoma. "It is undisputed that Oklahoma was not a state which was allowed to assert civil jurisdiction over Indian Tribes under Public Law 280." *Cossey*, 2009 OK 6, 212 P.3d 447 (Kauger, J., concurring in part/dissenting in part ¶ 26); *Okla.Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 125, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993) ("Oklahoma did not assume jurisdiction pursuant to Pub.L. 280."). And IGRA did not expressly grant civil-adjudicatory jurisdiction to the State of Oklahoma,[25] but rather, included a provision "which allowed tribes and states to negotiate an allocation of jurisdiction to the states."[26]

¶ 23 The intention of the parties to the negotiation of the model gaming compact is clear. The Governor of the State of Oklahoma did not negotiate an allocation of civil-adjudicatory jurisdiction to the courts of this state. In its order confirming the arbitrator's decision in *Comanche Nation*, the federal court pointed out that the Governor *did not dispute any of the facts outlined by the Tribes in their Motion for Summary Judgment and did not assert any affirmative defenses or arguments precluding certification of the Arbitration Award*. Supplement to Record on Accelerated Appeal, Ex. 4 at 6–7. The Governor instead stated in the response that "if Part 12 of the Tribes' Compacts, which authorizes the submission of disputes over the terms and conditions of the Compacts to arbitration, is valid, **then the Arbitration Award should be deemed valid and certified.**" *Id.* (emphasis added).[27]

¶ 24 Additionally, as the separate writing in *Dye* pointed out, the Governor of Oklahoma and the State Treasurer, the lead negotiators for the 2004 model gaming compact, "attached as exhibits to their Amicus Curiae brief filed on March 9, 2009, in *Cossey*, copies of sworn affidavits which indicate they negotiated and signed the compact with the intent that the phrase 'a court of competent juris-

---

**23.** "Congress can and does decide whether the State of Oklahoma may assert civil jurisdiction over Indian tribes, notwithstanding the assertion that 'adjudicatory jurisdiction is constitutionally vested in our state courts.'" *Dye*, 2009 OK 52, 230 P.3d 507 (Kauger, J., concurring in part/dissenting in part ¶ 11) (citing the federal Indian Child Welfare Act and the Indian Gaming Regulatory Act as examples). *See also Muhammad*, 2010 WL 4365568, at *9 (finding that state courts "have no authority over conduct by a tribal entity occurring on tribal land unless such authority is expressly granted to them"); *Williams v. Lee*, 358 U.S. 217, 221, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959) (stating that when "Congress has wished the states to exercise" civil-adjudicatory or criminal jurisdiction, it has expressly granted them the power to do so).

**24.** "Pub.L. 280 gave federal consent to the assumption of state civil and criminal jurisdiction over Indian country and provided the procedures by which such an assumption could be made. As originally enacted, Pub.L. 280 did not require the States to obtain the consent of affected Indian tribes before assuming jurisdiction over them, but Title IV of the Civil Rights Act of 1968 amended Pub.L. 280 to require that all subsequent assertions of jurisdiction be preceded by tribal consent." *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g*, 476 U.S. 877, 879, 106 S.Ct. 2305, 90 L.Ed.2d 881 (1986) (internal citations omitted).

**25.** *Dye*, 2009 OK 52, 230 P.3d 507 (Reif, J., dissenting ¶ 4) ("[T]he Federal Indian Gaming Act does not involve a Congressional delegation of power to the State of Oklahoma.").

**26.** *Dye*, 2009 OK 52, 230 P.3d 507 (Kauger, J., concurring in part/dissenting in part ¶ 12) (citing 25 U.S.C § 2710(d)(3)(C)).

**27.** The federal court found that "Part 12, the dispute-resolution clause of the Tribes' Compacts is valid, thereby making arbitration the proper forum to interpret the phrase 'court of competent jurisdiction' as used in the Tribes' Compacts." Supplement to Record on Accelerated Appeal, Ex. 4 at 7.

diction' *was not a provision intended to extend the jurisdiction of State courts. Rather, it was intended to preserve preexisting Tribal court jurisdiction over claims arising in Indian country against Indian Tribes."* *Dye*, 2009 OK 52, 230 P.3d 507 (Kauger, J., concurring in part/dissenting in part ¶ 2 & n. 2) (internal citations omitted) (emphasis added).

¶ 25 Other provisions in the compact support the conclusion that tribal courts and tribally designated forums have *exclusive* civil-adjudicatory jurisdiction over all compact-based tort or prize claim lawsuits. As the Tenth Circuit pointed out in *Santana:*

> Part 6(A) of the compact charges the tribe, not the state, with ensuring that patrons are afforded due process. *See* 3A Okla. Stat. Ann § 281, Part 6(A) ("The enterprise shall ensure that patrons of a facility are afforded due process in seeking and receiving just and reasonable compensation for a tort claim for personal injury or property damage."). Part 6(A)(4)-(10) establishes the procedure by which tort claims are filed with and processed by tribal officials. And Part 5(A) obligates the tribe to promulgate rules and regulations necessary to implement the compact.

*Santana,* 508 Fed.Appx. at 823.

We hold the model gaming compact preserved the civil-adjudicatory jurisdictional status quo, and Oklahoma state courts are not courts of competent jurisdiction as the term is used in the model gaming compact "to adjudicate tort claims against Indian tribes for tribal activity on tribal land." *Griffith*, 2009 OK 51, 230 P.3d 488 (Reif, J., dissenting ¶ 4). To the extent *Dye, Cossey,* and *Griffith* conclude otherwise, they are overruled.

### Dram–Shop Liability

¶ 26 The Plaintiffs in the present case argue that regardless of whether we construe the compact to include the courts of the State of Oklahoma as courts of competent jurisdiction, the gaming compact does not apply to their dram-shop claim so they can pursue the claim in state court, relying on *Bittle v. Bahe,* 2008 OK 10, 192 P.3d 810. In response, the tribe maintains the compact is applicable to

the dram-shop claim but asks this Court to overrule *Bittle.* The tribe's argument is two-fold—Congress has not expressly and unequivocally abrogated tribal sovereign immunity from private dram-shop actions and the tribe did not waive its sovereign immunity by applying for and receiving a state liquor license.

¶ 27 *Bittle v. Bahe* was decided in 2008. Shatona Bittle brought an action to recover damages for personal injuries suffered in a motor vehicle collision caused by the alleged negligence of Valentine Bahe. *Id.* ¶ 2, 192 P.3d at 813. Bittle alleged the defendants, Bahe and Val Tsosie, had been at the Thunderbird Entertainment Center, where employees of the casino served alcoholic beverages to Bahe, who was obviously intoxicated. *Id.* ¶ 3, 192 P.3d at 813. Bittle also alleged the Absentee Shawnee Tribe of Oklahoma, who owned the Thunderbird Entertainment Center, was liable under a theory of dram-shop liability. *Id.*

¶ 28 The trial court dismissed the tribe on sovereign immunity grounds, but this Court reversed and determined that *Rice v. Rehner,* 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983), in conjunction with 18 U.S.C. § 1161, abrogated any tribal immunity from suit in the area of alcoholic beverage laws. *Bittle,* 2008 OK 10, ¶ 37–38, 192 P.3d at 823. The Court also held the tribe waived its sovereign immunity when it applied for and received a mixed beverage license from the State of Oklahoma. *Id.* ¶ 53, 192 P.3d at 827.

¶ 29 In 2011, this Court issued opinions in *Seneca Telephone Co. v. Miami Tribe of Oklahoma* and *Dilliner v. Seneca–Cayuga Tribe of Oklahoma.* In *Seneca Telephone Co.,* 2011 OK 15, 253 P.3d 53, the Miami Tribe of Oklahoma, d/b/a White Loon Construction Company, performed excavation work for the Shawnee tribe. *Id.* ¶ 2, 53 P.3d at 54. During the excavation work, White Loon cut Seneca Telephone Company's underground telephone lines on four separate occasions damaging the underground telephone cables. *Id.* Seneca Telephone Company filed four separate small-claims suits against the Miami Tribe, alleging White Loon Construction was negligent in performing the work. *Id.* ¶ 6, 53 P.3d at 55. The

Miami Tribe claimed sovereign immunity. *Id.* ¶ 2, 53 P.3d at 54.

¶ 30 This Court held the tribe did not waive its sovereign immunity and could not be sued for negligence in state court. The Court observed that the "harsh reality in the present case, [was] that Seneca did not have the opportunity to negotiate a waiver of the sovereign immunity with the negligent party, but was an innocent third party to the negligence of a tribal enterprise." *Id.* ¶ 8, 53 P.3d at 55. We acknowledged the result left Seneca Telephone Company without a remedy against the tribe for their damages even when the assertions of negligence by the tribal enterprise were correct. *Id.*

¶ 31 Although this Court expressed frustration with such a policy, we recognized Congress would have to pass legislation limiting the sovereign immunity of Indian tribes. *Id.* We reviewed the statute in question and found it "apparent that the United States Congress ha[d] not authorized suit against the Tribe in this matter." *Id.* ¶ 10, 53 P.3d at 56. We also explained "[w]aiver for a federally-recognized tribe to be sued must be *unequivocal*" and found the tribe had not unequivocally waived its sovereign immunity. *Id.* ¶ 5, 53 P.3d at 55. This Court held **the tribe was immune from a negligence action in state court absent an express waiver by the tribe or express abrogation by Congress,** and we warned businesses they must "condition the performance of a contract upon an express waiver of sovereign immunity" or "act at their own peril when dealing with [an Indian] tribe." *Id.* ¶ 6, 53 P.3d at 55.[28]

¶ 32 In *Dilliner* we upheld the sovereign immunity of the Seneca–Cayuga Tribe in a lawsuit stemming from the alleged breach of an employment contract. *Dilliner,* 2011 OK 61, 258 P.3d 516. The Seneca–Cayuga Business Committee passed Resolution # 27–072607, which stated the Chief of the Tribe was authorized to sign a three-year employment agreement between the Seneca–Cayuga Tribe of Oklahoma and tribal employees. *Id.* ¶ 5, 258 P.3d at 517–18. The Business Com-

mittee of the Tribe, at its regular business meeting, passed a resolution in an attempt to ratify Resolution # 27–072607. *Id.* ¶ 6, 258 P.3d at 518. Resolution # 46–081407 recited that the Business Committee had approved Resolution # 27–072607 on July 26, 2007, which was authorization for the Chief to sign a three-year employment agreement with tribal employees, and that the Business Committee felt the action authorized by Resolution # 27–072607 was in the best interest of the Tribe and its government, and of the Tribal Corporations. *Id.* The Chief entered into employment contracts with tribal employees for terms of three years. *Id.* ¶ 4, 258 P.3d at 517. The employment contracts contained a provision for limited waiver of sovereign immunity. *Id.* The plaintiffs were terminated from employment prior to the end of the three-year term and filed suit in the district court of Ottawa County to recover their base salaries until the end of the term. *Id.* ¶ 7, 258 P.3d at 518. The tribe moved to dismiss on the grounds of tribal sovereign immunity. *Id.*

¶ 33 This Court found that neither of the resolutions expressly ratified the contracts entered into by the Chief: "Resolution # 27–072607 only authorized the Chief to sign a contract with tribal employees for a three-year term, in their present positions of employment and at their present salaries; Resolution # 46–081407 ratified only the resolution, not the contracts." *Id.* ¶ 20, 258 P.3d at 520. Because under the tribe's constitution and by-laws the business committee had to waive tribal immunity by resolution, we found that waiver of sovereign immunity was neither expressed nor consented to by the tribe because no resolution was passed by the committee expressly waiving immunity in the employment contracts. *Id.* We held the tribe was **immune from suit on the employment contract and reiterated that "[f]ederal law requires that the waiver of sovereign immunity be express and unequivocal; it cannot be implied."** *Id.* ¶ 19, 258 P.3d at 520 (emphasis added).[29]

¶ 34 In light of our holdings in *Seneca Telephone Co.* and *Dilliner,* we reexamine

---

28. *Seneca Telephone Co.* was a 7–2 decision.

29. Seven Justices also concurred in the *Dilliner* decision.

the question of whether a tort claim allegedly arising from the negligent sale of alcohol to an intoxicated individual at a tribal casino subjects a tribe to state court jurisdiction. In *Brigance v. Velvet Dove Restaurant, Inc.*, 1986 OK 41, ¶ 24, 725 P.2d 300, 306, the seminal case creating a duty for a commercial vendor of alcohol, this Court rejected the doctrine of tavern owner nonliability and held that "public policy is better served by holding that the *common law principles of negligence* are applicable where a commercial vendor for on the premises consumption is shown to have sold or furnished intoxicating beverages to a person who was noticeably intoxicated." (emphasis added). A commercial vendor for on the premises consumption **is under a duty** to "exercise reasonable care in selling or furnishing liquor to persons who by previous intoxication may lack full capacity of self-control to operate a motor vehicle and who may subsequently injure a third party." *Id.* ¶ 18, 725 P.2d at 305.

¶ 35 In *Copeland v. Tela Corp.*, 1999 OK 81, 996 P.2d 931, we reiterated the holding in *Brigance* and cited the elements of a common law negligence action as the standard for determining liability in a dram-shop action: " '(1) the existence of a duty on the part of the defendant to protect plaintiff from injury; (2) a violation of that duty; and (3) injury proximately resulting therefrom.' "

¶ 36 In the case before us, the Plaintiffs allege the Peoria Tribe is liable for their injuries because prior to the accident, casino employees allegedly negligently served alcoholic beverages to patrons of the casino who were noticeably intoxicated. Plaintiffs argue the tribe is subject to this Court's dram-shop case law because the tribe is acting as a commercial vendor providing alcohol to patrons of its tribal casino. However, tribal sovereign "immunity applies to the tribe's *commercial* as well as governmental activities." *Seneca Tel. Co.*, 2011 OK 15, ¶ 5, 253 P.3d at 55 (emphasis added).

¶ 37 It is well settled that states have the authority to require tribes that sell alcohol on tribal land to obtain a state liquor license to sell liquor for off-premises consumption. The United States Supreme Court discussed the regulation of alcohol on Indian land in *Rice v. Rehner*, 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983). *Rice* involved a federally licensed Indian trader who operated a general store on the Pala Reservation. *Id.* at 716, 103 S.Ct. 3291. The Pala Tribe had adopted a tribal ordinance permitting the sale of liquor on the reservation under 18 U.S.C. § 1161, but the trader **sought exemption from state liquor licensing requirements.** *Id.* The question before the U.S. Supreme Court was very narrow—whether 18 U.S.C. § 1161 prohibited the State of California from requiring the trader "to obtain a state liquor license in order to sell liquor for off-premises consumption." *Id.* at 715, 103 S.Ct. 3291. Because California sought **regulatory authority** over the issuance and administration of liquor licenses, *Id.* at 713, 103 S.Ct. 3291, the Supreme Court analyzed the case under "the principles to be applied in determining whether *state regulation of activities in Indian country is pre-empted* " by federal law. *Id.* at 718, 103 S.Ct. 3291 (emphasis added).

¶ 38 The Court explained "[t]he role of tribal sovereignty in pre-emption analysis varies in accordance with the particular 'notions of sovereignty that have developed from historical traditions of tribal independence.' " *Id.* at 719, 103 S.Ct. 3291. The Court went on:

> When we determine that tradition has recognized a sovereign immunity in favor of the Indians in some respect, then we usually are reluctant to infer that Congress has authorized the assertion of state authority in that respect "except where Congress has expressly provided that State laws shall apply. . . ." If, however, we do not find such a tradition, or if we determine that the balance of state, federal, and tribal interests so requires, our pre-emption analysis may accord less weight to the "backdrop" of tribal sovereignty.

*Id.* at 720, 103 S.Ct. 3291 (internal citations omitted).

¶ 39 In determining the "backdrop" of tribal sovereignty, the Court examined the history of liquor regulation in Indian Country and concluded that "tradition simply has not recognized a sovereign immunity or inherent

authority in favor of liquor regulation by Indians." *Id.* at 722, 103 S.Ct. 3291. The Court noted that "[t]he colonists regulated Indian liquor trading before this Nation was formed," and that Congress had "imposed complete prohibition by 1832." *Id.* at 722, 103 S.Ct. 3291. The Court went on to find there was a "historical tradition of concurrent state and federal jurisdiction over the use and distribution of alcoholic beverages in Indian country." *Id.* at 724, 103 S.Ct. 3291. The Court concluded that " '[t]he legislative history of § 1161 indicates both that Congress intended to remove federal prohibition on the sale and use of alcohol imposed on Indians in 1832, and that Congress intended that state laws would apply of their own force to govern tribal liquor transactions as long as the tribe itself approved these transactions by enacting an ordinance." *Id.* at 726, 103 S.Ct. 3291. The *Rice* Court held 18 U.S.C. § 1161 authorized California to require a federally licensed Indian trader operating a store on a reservation to obtain a state liquor license to sell alcohol for off-premises consumption. *Id.* at 715–16, 733–34, 103 S.Ct. 3291.

¶ 40 Although the sale of alcohol was involved in *Rice*, its holding is limited to a **regulatory jurisdictional analysis** and is not dispositive of a private dram-shop action against an Indian tribe in state court.[30] In *Rice*, the Pala Tribe was not a party to the case, the tribe's sovereign immunity was not at issue, and neither the State of California nor a private citizen of that state was attempting to assert state civil-adjudicatory jurisdiction over the tribe. In contrast, a dram-shop action against a tribe is a tort where a private party attempts to assert

state court civil-adjudicatory jurisdiction over the tribe—**governmental regulation of the seller of alcohol is not an element of a dram-shop action.** In the present case, the Peoria Tribe is a party to the case, and its sovereign immunity is *directly at issue.* **The state of Oklahoma is not involved in this case and is not attempting to assert any type of jurisdiction over the Peoria tribe.**

 ¶ 41 After further consideration of this issue, we can find no articulable reason to treat a private dram-shop action against a tribe in state court any differently than a tort or contract claim against a tribe in state court because the sale of alcohol is involved. A "tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity. Waiver of sovereign immunity cannot be implied but must be unequivocally expressed." *Dilliner,* 2011 OK 61, ¶ 12, 258 P.3d at 519; *Seneca Tel. Co.,* 2011 OK 15, ¶ 5, 253 P.3d at 55.

 ¶ 42 Congress has not expressly abrogated tribal immunity in private dram-shop claims. Before 18 U.S.C. § 1161 was enacted, the sale and use of alcohol on Indian land was prohibited by the federal government. *Rice,* 463 U.S. at 726, 103 S.Ct. 3291. Section 1161 was enacted "to eliminate federal prohibition because it was discriminatory and had a detrimental effect on Indians." *Id.* at 727, 103 S.Ct. 3291. It was "intended to eliminate all of the sections in the statutes which discriminate against Indians" while at the same time not interfere with state laws and "provide opportunity for the tribes to have prohibition on the reservation if they

---

**30.** *Furry v. Miccosukee Tribe of Indians of Fla.,* 685 F.3d 1224, 1233 (11th Cir.2012) (finding that "the composite of Furry's argument would require us to ignore the fact that the Supreme Court [in *Rice* ] was speaking to a wholly different issue"); *Durante v. Mohegan Tribal Gaming Auth.,* No. X04HHDCV116022130S, 2012 WL 1292655, at *5 (Sup.Ct.Conn.2012) (finding *Rice* inapplicable because of "the distinction between subjecting a tribe to state regulation and permitting it to be sued"); *Filer v. Tohono,* 212 Ariz. 167, 129 P.3d 78, 84 (App.2006) (finding *Rice* 's broad language "must be viewed in context" and that *Rice* did not decide, and "certainly did not hold that California, let alone its private citizens, could sue the tribe in state court" when the

action had some connection to the state's regulation of alcohol); *Foxworthy v. Puyallup Tribe of Indians Ass'n,* 141 Wash.App. 221, 169 P.3d 53, 58 (2007) (finding that *Rice*'s holding was result of "long-standing lack of tribal control over alcohol, which had always been subject to regulation by some non-tribal governmental entity—initially the federal government and later the states" but that there was "no analogous legislative history supporting the type of private cause of action that Foxworthy advocates"); *Holguin v. Ysleta Del Sur Pueblo,* 954 S.W.2d 843, 854, (Tex.App. 1997) (finding *Rice* inapplicable and determining that tribal sovereign immunity was not waived "for a *private suit* brought under the Texas Dram Shop Act").

wish to, if it is not covered by State law." *Id.*

Section 1161 provides:

The provisions of sections 1154, 1156, 3113, 3488, and 3669 of this title, shall not apply within any area that is not Indian country, nor to any act or transaction within any area of Indian country provided such act or transaction is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country, certified by the Secretary of the Interior and published in the Federal Register.

18 U.S.C. § 1161.

¶ 43 Section 1161 does not demonstrate Congressional intent to subject Indian tribes to private dram-shop suits.[31] Although it requires conformity with state law and tribal ordinance, § 1161 provides no mechanism for enforcement of state law, either by a state or a private party, if the tribe violates state law. Nowhere in the text of § 1161 is there **any** mention of tribal immunity from suit, much less an **unequivocal** abrogation of tribal immunity with respect to private lawsuits alleging an Indian tribe has violated state dram-shop laws. We find Congress has not expressly abrogated the Peoria Tribe's immunity in private dram-shop claims.

■■■ ¶ 44 We also find the Peoria Tribe did not expressly waive its sovereign immunity when it applied for and received a state liquor license. In the present case, although

the Peoria Tribe admits in its brief that it applied for and received a liquor license from the State of Oklahoma, the record is void of any evidence that the tribe expressly and unequivocally waived its immunity when it applied for and received a state liquor license. **Neither the liquor license nor the application for the liquor license has been included in our record.**

¶ 45 Assuming, as the parties do, that the license application in this case states the applicant will "not violate any of the laws of the United States, the State of Oklahoma, or applicable municipal ordinances,"[32] there was no waiver of sovereign immunity by the Peoria Tribe when it applied for and received a state liquor license. Applying for and accepting a state liquor license "is nothing more than a promise to comply with state liquor laws, not a voluntary waiver of sovereign immunity for private party lawsuits." *Bittle,* 2008 OK 10, 192 P.3d 810 (Kauger, J., dissenting ¶ 36).[33] A determination to the contrary amounts to an implied waiver of sovereign immunity, which we expressly rejected in *Dilliner,* 2011 OK 61, ¶ 19, 258 P.3d at 520.

¶ 46 We hold the Peoria Tribe is immune from dram-shop liability in state court, and in doing so, align ourselves with all other courts addressing this issue[34]—most notably, the United States Court of Appeals for the Eleventh Circuit. In *Furry v. Miccosukee Tribe of Indians of Florida,* 685 F.3d 1224, 1226 (11th Cir.2012), *cert. denied,* — U.S. —,

**31.** *Furry,* 685 F.3d at 1233 ("Congressional enactment of 18 U.S.C. § 1161 hardly demonstrates an 'unmistakably clear' intention to subject the Indian tribes to private tort suits.").

**32.** *Bittle,* 2008 OK 10, ¶ 48, 192 P.3d at 826.

**33.** Recent decisions from the Tenth Circuit and Sixth Circuit also refute the idea that a tribe's agreement to comply with a specific law is an implicit waiver of sovereign immunity. *See Nanomantube v. Kickapoo Tribe in Kan.,* 631 F.3d 1150, 1153 (10th Cir.2011) (holding the tribe's agreement to comply with Title VII, and similar agreements to comply with other federal statutes, might have "convey[ed] a promise not to discriminate, but ... in no way constitute[d] an express and unequivocal waiver of sovereign immunity and consent to be sued in federal court"); *Memphis Biofuels v. Chickasaw Nation Indus.,*

*Inc.,* 585 F.3d 917, 920 (6th Cir.2009) (holding the tribe's act of incorporating under Section 17 of the Indian Reorganization Act was not an express waiver of sovereign immunity when the statute was silent as to whether incorporated tribes under Section 17 have sovereign immunity).

**34.** *Durante,* 2012 WL 1292655, at *5 (finding the Mohegan tribe immune from a private dram-shop claim); *Foxworthy,* 141 Wash.App. 221, 169 P.3d 53, 59 (finding the Puyallup tribe was immune from dram-shop liability in state court); *Filer,* 212 Ariz. 167, 129 P.3d 78, 84 (concluding Arizona state courts lacked jurisdiction to adjudicate a private dram-shop action against the Tohono O'Odham Nation); *Holguin,* 954 S.W.2d 843, 854 (finding Ysleta Del Sur Pueblo's sovereign immunity was not waived "for a *private suit* brought under the Texas Dram Shop Act").

133 S.Ct. 663, 184 L.Ed.2d 462 (2012), Mr. Furry, as personal representative of the estate of his daughter Tatiana Furry, complained that the Miccosukee Tribe violated 18 U.S.C. § 1161 and Florida's dram-shop law by knowingly serving excessive amounts of alcohol to his daughter. *Id.* After allegedly being served excessive amounts of alcohol, the daughter got in her car, drove off while intoxicated, and ended up in a fatal head-on collision with another vehicle on a highway just outside Miami, Florida. *Id.* at 1227. Mr. Furry filed suit in federal district court in Florida, and the Miccosukee Tribe moved to dismiss the complaint on the jurisdictional ground that it was immune from suit under the doctrine of tribal sovereign immunity. *Id.* The district court dismissed the tribe on sovereign immunity grounds. *Id.*

¶ 47 On appeal to the Eleventh Circuit, Mr. Furry claimed "18 U.S.C. 1161, read in concert with the Supreme Court's decision in [*Rice v.*] *Rehner*, establishe[d] that Congress has subjected the tribes to private tort actions." *Id.* at 1230. The Eleventh Circuit rejected this argument and found "[t]he Supreme Court has made clear that a suit against an Indian tribe is barred unless the tribe has clearly waived its immunity or Congress has expressly and unequivocally abrogated that immunity." *Id.* at 1226. The court found *Rice v. Rehner* was not dispositive because "the Supreme Court was speaking to a wholly different issue" in that case, and "[n]otably absent from *Rehner* . . . was an analysis of tribal immunity from suit." *Id.* at 1230–31. The court also held that

"[w]hile § 1161 requires conformity with state law and tribal ordinance, it says nothing at all about the means of enforcement if the tribe violates state law." *Id.* at 1231.[35]

¶ 48 Mr. Furry also argued the Miccosukee Tribe waived its immunity from private tort actions by applying for and receiving a state liquor license. The Eleventh Circuit rejected this argument as well and found that "waiver may not be inferred or implied from a tribe's conduct," and "[a]t no point in the liquor license application or the accompanying affidavit did the Miccosukee Tribe waive its immunity or consent to be subject to suit of any kind, much less to a private dram shop action." *Id.* at 1235. The Eleventh Circuit concluded that the doctrine of tribal sovereign immunity "remains the law of the land until Congress or the Supreme Court tells us otherwise."[36]

¶ 49 We agree. "While Congress and the United States Supreme Court have determined that a state may regulate and license alcoholic beverages on Indian land, neither has addressed the waiver of tribal sovereignty immunity from private dram-shop actions in state court."[37] Additionally, the State of Oklahoma has not negotiated the allocation of civil-adjudicatory jurisdiction to the courts of this state through the model gaming compact and has not conditioned the granting of a liquor license to a tribal gaming enterprise on an express waiver of sovereign immunity. Until such actions are taken, the tribes and their gaming enterprise are entitled to assert sov-

**35.** Mr. Furry relied heavily on this Court's 2008 decision in *Bittle* in an attempt to convince the Eleventh Circuit to reverse the district court's dismissal of the tribe. However, the Eleventh Circuit refused to follow *Bittle:*

Notwithstanding the admonition of the United States Supreme Court in *Kiowa Tribe* that "[t]here is a difference between the right to demand compliance with state laws and the means available to enforce them," the Oklahoma Supreme Court determined that private tort actions to enforce compliance with state liquor laws were permissible because the "state law remedy to recover money damages furthers the legitimate objectives of the state's liquor laws." Although the Oklahoma Supreme Court's analysis does not bind this Court in any way, we also find it *unpersuasive and inconsistent with precedents from this Court and the United States Supreme*

*Court, which have established that congressional abrogation of tribal immunity must be express and unequivocal.*
*Id.* at 1234, n. 7 (internal citations omitted) (emphasis added).

**36.** *Id.* at 1237. While pronouncement on a *federal-law* question by an inferior federal court is not binding on this Court, it is persuasive and instructive. *Mehdipour v. State ex rel. Dept. of Corrs.*, 2004 OK 19, ¶ 18, 90 P.3d 546, 553; *Phillips v. Williams*, 1980 OK 25, ¶ 10, 608 P.2d 1131, 1135. "[T]ribal immunity is a matter of federal law." *Kiowa Tribe of Okla. v. Mfg. Tech., Inc.*, 523 U.S. 751, 759, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998).

**37.** *Bittle*, 2008 OK 10, 192 P.3d 810 (Kauger, J., dissenting ¶ 37).

ereign immunity when sued in state court for dram-shop liability.[38]

### Conclusion

¶ 50 We hold the Peoria Tribe is immune from compact-based tort or prize claims in state court because Oklahoma state courts are not courts of competent jurisdiction as the term is used in the model gaming compact. To the extent *Dye*, 2009 OK 52, 230 P.3d 507, *Griffith*, 2009 OK 51, 230 P.3d 488, and *Cossey*, 2009 OK 6, 212 P.3d 447 conclude otherwise, they are overruled. We also hold that because Congress has not expressly abrogated tribal immunity from private, state court dram-shop claims and because the record is void of any evidence that the Peoria Tribe expressly and unequivocally waived its immunity when it applied for and received a state liquor license, the tribe is immune from dram-shop liability in state court. *Bittle v. Bahe*, 2008 OK 10, 192 P.3d 810, is overruled. The trial court's dismissal of the Peoria Tribe and its entities is affirmed.

### AFFIRMED

¶ 51 Reif, V.C.J., Kauger, Edmondson, Combs and Gurich, JJ., concur.

¶ 52 Colbert, C.J., Watt (by separate writing), Winchester and Taylor, JJ., dissent.

¶ 53 TAYLOR, J., with whom WINCHESTER, J., joins, dissenting.

Over the past century, the United States Supreme Court, with little analysis and almost by accident, developed the doctrine of tribal immunity to protect nascent tribal governments and tribal self-governance from encroachments by the States; and some fifteen years ago, the High Court expressly doubted its wisdom in the modern economy where the immunity can harm those who are unaware they are dealing with a tribe, particularly tort victims. *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 756, 758, 118 S.Ct. 1700, 1703, 1704, 140

L.Ed.2d 981. Without any compelling reason or precedential authority, today's opinion expands the federal judge-made default doctrine of tribal immunity at the State's expense, diminishing the authority of the state courts and wiping out state law protections for its citizens harmed by tribal commercial activities. I must respectfully dissent.

WATT, J., with whom COLBERT, C.J., WINCHESTER and TAYLOR, JJ. join, dissenting.

¶ 1 I respectfully dissent on two grounds. First, it is my opinion that *Griffith*, *Dye*, and *Cossey* remain good law.

¶ 2 It should be made clear we held in *Cossey* that state courts were "courts of competent jurisdiction." *Cossey* did **not** hold that tribal courts could not hear tort cases arising from injuries incurred at tribal-owned casinos under a gaming compact. However, we did recognize that two sovereigns met to negotiate a compact which resulted in a lack of specificity as to naming a **particular** "court of competent jurisdiction." Congress enacted the IGRA, 25 U.S.C. §§ 2701–2721; 18 U.S.C. 1166–1168 (2000), which authorized the states and the tribes to negotiate the terms of the compact on numerous subjects and "any other subjects that are directly related to the operation of gaming activities." 25 U.S.C. § 2710(d)(3)(C)(vii). The authority to specify the court in which jurisdiction would rest was, therefore, given to both negotiating parties. Neither in the IGRA nor the compact is there any prohibition in specifying what court hears tort claims. The Tribe and the State, both sovereigns, negotiated a compact, and no arguments were presented that there was unfair bargaining power held by one or the other of these parties. Indeed, the Compact, Part 6, incorporates the Oklahoma Governmental Tort Claims Act as a liability limit reference point and the procedure for initiating claims under the

---

**38.** Plaintiffs' dram-shop claim against the tribe is precluded in state court because Oklahoma state courts are not courts of competent jurisdiction as the term is used in the model gaming compact, Congress has not expressly abrogated tribal immunity from private, state-court dram shop claims, and the Peoria Tribe did not expressly

and unequivocally waive its immunity when it applied for and received a state liquor license. As such, we need not decide whether a dram-shop claim against a tribe is considered a compact-based tort claim under the model gaming compact.

compact. If only tribal courts were ever contemplated, as disingenuously argued **after** the case was submitted to this Court on appeal from a certified interlocutory order, why did these negotiating parties not specify "tribal courts" as the only possible tribunals? At the time *Cossey* was decided, this Court carefully considered whether our holding would in any way jeopardize the Tribes' ability to self-govern, as it relates to matters tribes always retain as a matter of their inherent sovereignty. These powers involve the relations among members of a tribe. In deciding our holding did not infringe upon those tribal powers, we cited *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), describing them:

> Thus, in addition to the power to punish tribal offenders, the Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members ... But exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive **without express congressional delegation.** [citations omitted]

¶ 3 The Supreme Court distinguished the above from those powers of sovereignty which have been divested. See *Montana v. U.S.*, 450 U.S. at 564, 101 S.Ct. 1245:

> The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving *the relations between an Indian tribe and nonmembers of the tribe....*

¶ 4 Part 9 of the Compact states: "This Compact shall not alter tribal, federal or state civil adjudicatory or criminal jurisdiction." Thus, at the time the Tribe and the State began negotiating the compact, the law already implied divestiture of sovereign immunity between the Tribe and non-members of the Tribe. Never was it contemplated that the tribe's rights to govern itself and members of the tribe would be infringed upon by negotiating the compact. On the other hand, negotiations between two equal sovereigns assumes equal bargaining power and equal responsibility for specifying terms

for the compact, particularly when the Tribe is negotiating with "nonmembers of the tribe." Moreover, Congress provided all tribes with the ability, through the IGRA, to negotiate a suitable compact with the states in order to benefit the Tribe financially. Holding the Tribe to the benefit of its bargain under the compact did not divest the Tribe of its inherent sovereignty to remain in control of its tribal powers to govern itself and its members.

¶ 5 It is clear that the Tribe gave a limited consent to suit for patron tort claims under the compacts, with a limit placed on the Tribe's total liability. Without more specificity as to where tort claims would be litigated, this limited consent to suit was left open as to forum, indicating the parties knew more than one choice of forums was available. **The fact the compacts did not state the precise forum renders the choice of a state court forum equally as valid as a tribal court.** There are no "magic words" required. See *C & L Enterprises v. Citizen Band of Potawatomi Indian Tribe*, 532 U.S. 411, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001).

¶ 6 Even more unsettling to me is the majority's willingness to relinquish this Court's jurisdiction to the federal courts. We have acknowledged that we are bound by decisions of the United States Supreme Court, by virtue of the Supremacy Clause, and must conform to extant Supreme Court jurisprudence. *Akin v. Missouri Pacific Railroad Co.*, 1998 OK 102, ¶ 30, 977 P.2d 1040, 1052. However, we have also recognized that "nothing in the concept of supremacy or in any other principle of law requires subordination of state courts to the inferior federal courts." *Akin*, 1998 OK at ¶ 30, 977 P.2d at 1052, citing *A.L. Lockhart v. Fretwell*, 506 U.S. 364, 376, 113 S.Ct. 838, 846, 122 L.Ed.2d 180 (1993) (Thomas, J., concurring). State courts may promulgate judicial decisions grounded in their own interpretation of federal law. *Akin*, 1998 OK at 105, 977 P.2d 1040, citing *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 617, 109 S.Ct. 2037, 2045, 104 L.Ed.2d 696 (1989). While we pay voluntary deference to the pronouncements from our circuit, compelling reason to depart from our commitment to comity exists when an

inferior federal court interprets a Supreme Court decision in a way that is erroneous and where following it would be to perpetuate error. We said in *Akin:*

> Our independent obligation correctly to interpret Supreme Court decisions is of greater importance than the object, desirable as it is, of achieving harmony between state and federal courts within our state.

1998 OK 102, ¶ 30, 977 P.2d at 1052.

¶ 7 The majority has cited eight **unpublished** cases [1] from federal courts, other than the U.S. Supreme Court, to support its position that the compacts did not waive the tribe's sovereign immunity against tort suits in Oklahoma state courts. These decisions are not binding on this Court. In one case cited,[2] the U.S. Supreme Court denied certiorari. However, denial of certiorari by the United States Supreme Court does not constitute an expression on the merits of the case,[3] or make the lower court's decision the supreme law of the land.[4]

¶ 8 We are not bound by the decisions of inferior federal courts, and we are also not governed by them. This Court is the highest court of Oklahoma with concurrent jurisdiction to consider cases arising from state or federal law. The injunction, issued by an inferior federal court against this Court and all courts of this State, from considering tort claims under Indian gaming compacts is an extra-jurisdictional order. The Supremacy Clause is not properly invoked. We exercised our jurisdiction to interpret federal law as it affects the jurisdiction of all courts of this State, as we are authorized to do. *Akin,*

supra, 1998 OK at 1052, 977 P.2d 1040, citing *ASARCO, Inc. v. Kadish,* supra. Only when, and if, the United States Supreme Court holds our state courts are not "courts of competent jurisdiction" for purposes of litigating patron tort claims arising from gaming compacts, will I concede otherwise. For the reasons expressed above, I respectfully dissent to this Court's pronouncement in the majority opinion.

1. *Santana v. Muscogee (Creek) Nation, ex rel. River Spirit Casino,* 12–5046, 2013 WL 323223 (10th Cir. Jan. 29, 2013), *cert. denied,* — U.S. —, 133 S.Ct. 2038, 185 L.Ed.2d 899 (2013); *Harris v. Muscogee (Creek) Nation,* 11–CV–654–GKF–FHM, 2012 WL 2279340 (N.D.Okla. June 18, 2012); *Tonkawa Tribe of Oklahoma v. Oklahoma,* 11–CV–782–W (W.D.Okla. Nov. 23, 2011); *Comanche Nation, Osage Nation, Delaware Nation, and Wichita and Affiliated Tribes v. Oklahoma,* 10–CV–01339–W (W.D.Okla. Dec. 28, 2010); *Cherokee Nation v. Oklahoma,* 10–CV–979–W (W.D.Okla. Nov. 22, 2010); *Eastern Shawnee Tribe of Oklahoma v. Oklahoma,* 10–CV–00459–W (W.D.Okla. July 1, 2010); *Choctaw Nation of Oklahoma, Chickasaw Nation v. Oklahoma,* 10–CV–00050–W, 2010 WL 5798663 (W.D.Okla. June 29, 2010); and *Muhammad v. Comanche*

*Nation Casino,* 09–CIV–968–D, 2010 WL 4365568.

2. The U.S. Supreme Court denied certiorari in *Santana v. Muscogee (Creek) Nation, ex rel. River Spirit Casino,* on April 29, 2013. See note 1 supra.

3. See *Evans v. Stephens,* 544 U.S. 942, 125 S.Ct. 2244, 161 L.Ed.2d 510 (2005); *United States v. Shubert,* 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279 (1955); *State of Maryland v. Baltimore Radio Show,* 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562 (1950).

4. *Deane Hill Country Club, Inc. v. City of Knoxville,* 379 F.2d 321 (6th Cir.1967).